# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ASIA ELKHALIL,

          Plaintiff,                          CASE NO.: 0:25-cv-60391-RS

v.                                     JURY TRIAL DEMANDED

EAST BEACH, LLC *d/b/a*
PIER 14 TAPAS AND COCKTAILS,

          Defendant.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, ASIA ELKHALIL ("Plaintiff" and/or "Ms. Elkhalil"), by and through her undersigned counsel, hereby complains of Defendant, EAST BEACH, LLC *d/b/a* PIER 14 TAPAS AND COCKTAILS ("Defendant" and/or "East Beach"), and alleges as follows:

### INTRODUCTION

1.     Ms. Elkhalil, a dedicated employee of Defendant for more than six (6) years, brings this action to seek redress for the Defendant's callous and unlawful acts of discrimination, harassment, and retaliation that she was forced to endure due to her sex and pregnancy.

2.     Ms. Elkhalil brings this action against Defendant pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg ("PWFA"); and the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes ("FCRA").

### PARTIES

3.     Ms. Elkhalil is an individual female residing in Broward County, Florida.

4.     Defendant is a Florida Limited Liability Company, with its principal place of business located at 14C Commercial Blvd., Lauderdale-by-the-Sea, FL 33308.

5.      At all times relevant, Ms. Elkhalil was employed at Defendant's store, located at 14C Commercial Blvd., Lauderdale-by-the-Sea, FL 33308.

6.      The exact number of Defendant's employees is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII, the PWFA, and the FCRA.

7.      At all relevant times, Defendant was an "employer" within the meaning of, 42 U.S.C. § 2000e(b).

8.      At all times relevant, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. § 2000e(f).

9.      At all relevant times, Defendant was a "covered entity" within the meaning of 42 U.S.C. § 2000gg(2).

10.      At all relevant times, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 2000gg(3).

11.      At all relevant times, Plaintiff was a "qualified employee" within the meaning of 42 U.S.C. § 2000gg(6).

12.      At all relevant times, Defendant was a "person" within the meaning of § 760.02(6), Florida Statutes, and an "employer" within the meaning of § 760.02(7), Florida Statutes.

**JURISDICTION AND VENUE**

13.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5(f); and 42 U.S.C. § 2000gg-2(a).

14.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida. The Defendant was and is still

located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

15.     Ms. Elkhalil has complied with all administrative requirements to file this action.

16.     On or around July 23, 2024, Ms. Elkhalil timely dual-filed a charge of discrimination (Charge No. 510-2023-09066) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

17.     On or around February 25, 2025, the EEOC issued Ms. Elkhalil's Notice of Right to Sue against Defendant.

18.     Ms. Elkhalil is timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue.

19.     Ms. Elkhalil is timely commencing this action more than one-hundred eighty (180) days following the filing of her charge of discrimination.

## FACTUAL ALLEGATIONS

20.     At all times material, Ms. Elkhalil was a female and was therefore a protected class member.

21.     At all times material, Ms. Elkhalil was pregnant and was therefore a protected class member.

22.     In or around December 2017, Ms. Elkhalil was hired by Mulligans Acquisition Inc. ("Mulligans") as a bartender.

23.     At all times material, Ms. Elkhalil was considered an exemplary employee and had a record of positive performance.

24.     For years, Ms. Elkhalil regularly worked as the lone bartender during her shifts and earned wages via tips. Although Ms. Elkhalil rarely worked alongside another bartender during her shift, the tips earned would be split into the number of bartenders working.

25.     In or around January of 2024, Mulligans was acquired by Defendant and rebranded to PIER 14 TAPAS AND COCKTAILS.

26.     Following Defendant's acquisition of Mulligans, Defendant continued to employ Ms. Elkhalil as a bartender.

27.     Ms. Elkhalil maintained a record of positive performance for Defendant.

28.     In or around March of 2024, Defendant hired Douglas Camargo ("Camargo") to the Manager position.

29.     At first, under the new management of Camargo, Ms. Elkhalil continued working as the lone bartender during her shifts.

30.     Defendant scheduled many male and female bartenders to work shifts by themselves.

31.     After several weeks, in or around April 12, 2024, Ms. Elkhalil became pregnant and decided to notify Camargo of her pregnancy. When Ms. Elkhalil went into Camargo's office, he was on the computer with his back facing the entrance. Ms. Elkhalil informed him that she was pregnant but was not due until September of 2024, and that she would need pregnancy-related accommodations moving forward. Camargo, uninterested, remained facing the computer and replied, "ok," and ended the conversation.

32.     Ms. Elkhalil asked if she could obtain pregnancy accommodations including additional breaks and limitations on physical exertions as her pregnancy-related medical conditions became more serious.

33.     Ms. Elkhalil was able to continue working as a bartender and fulfilling the essential functions of her position. Her pregnancy, however, caused her to become nauseous, especially because she was in her first trimester, impacting her ability to concentrate and focus. Ms. Elkhalil also needed to use the restroom more frequently as a result of her pregnancy, further requiring additional breaks.

34.     Ms. Elkhalil explained that her requested pregnancy-related accommodations included additional breaks and limiting excessive physical exertion, but Camargo did not respond.

35.     Ms. Elkhalil again asked Camargo about the pregnancy accommodations but he continued to ignore her before instructing her to go back to work.

36.     Ms. Elkhalil felt disrespected that Camargo failed to entertain a conversation regarding her pregnancy and failed to even turn around to acknowledge her. Ms. Elkhalil did nothing wrong, but Camargo appeared to be offended by the disclosure of her pregnancy and request for pregnancy-related accommodations.

37.     Later that day, Ms. Elkhalil asked Camargo about her pregnancy accommodations, but Camargo again ignored her.

38.     In fact, Camargo failed to discuss any pregnancy-related accommodation with Ms. Elkhalil for the duration of her employment.

39.     The very next day, Ms. Elkhalil was shocked to see the new shift schedule released by Camargo. Camargo had scheduled Floria Gerardino ("Floria"), a non-pregnant female employed by Defendant, to bartend shifts alongside Ms. Elkhalil.

40.     This came as a surprise to Ms. Elkhalil because Floria had never worked as a bartender previously and Ms. Elkhalil had worked as the lone bartender on the same shifts for years.

41.    To be clear, Ms. Elkhalil earned her wages via tips, and working alongside another bartender during her shift immediately cut her tips in half. Effectively, Camargo cut Ms. Elkhalil's wages by half by placing Floria to work alongside her.

42.    To this point, Floria had never worked as a bartender for Defendant and to Ms. Elkhalil's knowledge, Floria had no qualifications to bartend.

43.    Ms. Elkhalil had never been placed to work alongside another bartender during her employment with Defendant. Ms. Elkhalil had further never seen another male or non-pregnant bartender be placed to work alongside another bartender.

44.    Ms. Elkhalil was suspicious that her discussion with Camargo about becoming pregnant resulted in scheduling Floria to work alongside Ms. Elkhalil.

45.    So, in or around April 15, 2024, Ms. Elkhalil texted Camargo to ask about the new schedule. Camargo failed to respond so Ms. Elkhalil waited to discuss the matter with him in person.

46.    Camargo avoided Ms. Elkhalil during her next shift, but when she was about to leave, she stepped into his office. Ms. Elkhalil asked if he saw her text, and Camargo responded that he had. Ms. Elkhalil asked if she was supposed to train Floria, which upset Camargo. Camargo rudely responded by shouting to Ms. Elkhalil that the schedule was final and to stop asking about it moving forward.

47.    Ms. Elkhalil continued to work her assigned shifts, but realized Camargo stopped greeting her or acknowledging her presence despite greeting every other employee. Ms. Elkhalil found this to be extremely strange because Camargo's attitude shift and schedule changes came just days following her disclosure that she was pregnant.

48.     Several days later, in or around April 18, 2024, Camargo told Floria that her bartender training was complete and that Floria would begin splitting tips with Ms. Elkhalil starting Sunday, April 21, 2024.

49.     In or around April 21, 2024, Ms. Elkhalil and Floria worked together behind the bar. To be clear, this was Floria's first official bartending shift for Defendant.

50.     During the shift, Camargo pulled Floria aside and spoke to her for approximately 15 minutes while Ms. Elkhalil was performing all of the work. Ms. Elkhalil overheard the conversation, where Camargo told Floria that he would give her any shift that she wanted, including Ms. Elkhalil's regularly scheduled shifts that she had been working for the past few years.

51.     Following the conversation, Floria confirmed to Ms. Elkhalil exactly what Ms. Elkhalil overheard, and she apologized in advance for taking Ms. Elkhalil's regular shifts. Floria further said that Camargo explicitly told her to ignore Ms. Elkhalil when discussing coming to a shift early or late.

52.     Prior to this, it was customary for a bartender to inform other bartenders whether they would arrive a few minutes earlier or later, yet Camargo had unilaterally changed this policy to further undermine Ms. Elkhalil.

53.     Later that evening, Camargo released the shift schedule for the following week. To Ms. Elkhalil's disappointment, she saw that Camargo further cut her hours, reassigned her normal shifts to Floria and other bartenders, and regularly scheduled her to work alongside another bartender, ultimately reducing her tips and wages.

54.     Ms. Elkhalil was still working behind the bar when the schedule came out and she felt defeated. She knew that Camargo was punishing and intentionally ousting her because of her pregnancy. Ms. Elkhalil became upset and demoralized, but she continued to complete her shift.

55.     Towards the end of Ms. Elkhalil's shift, Camargo walked behind the bar, pretended to inspect a bottle, and slowly began to smirk as he mockingly said to Ms. Elkhalil, "what's wrong?"

56.     Ms. Elkhalil, trying to stay composed, told Camargo that she did not want to talk about the schedule while working, and wanted to speak in Camargo's office after she completed her shift.

57.     Camargo responded in an openly hostile and demeaning manner, smirking at Ms. Elkhalil in a slow, condescending manner before aggressively shouting, "What do you want!?" in front of several customers. His tone and demeanor were not only unprofessional but also humiliating, singling her out in a way that conveyed clear disdain.

58.     Ms. Elkhalil noticed that her customers became visibly uncomfortable with the confrontation, prompting her to attempt to de-escalate the situation by responding calmly.

59.     Ms. Elkhalil answered that she was unhappy with the current schedule because she was previously scheduled for busier shifts and knew that she would not be able to financially provide for herself with the new shifts.

60.     Camargo, giggling to himself like a child, responded in front of Ms. Elkhalil's colleagues and several of Defendant's customers, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?"

61.     Ms. Elkhalil's suspicions were confirmed to her and nearly a dozen witnesses: Camargo decreased her hours and assigned another bartender to her shift because she was pregnant.

62.     Ms. Elkhalil was embarrassed, insulted, and humiliated. She gave Camargo another chance to explain himself, asking if she was given a less favorable schedule because of her pregnancy. Camargo simply responded that she was, in fact, given a less-favorable schedule due to her pregnancy.

63.     Ms. Elkhalil tried to reason with Camargo, explaining that his decision was unfair and that she wanted to maintain the same schedule she had worked for years. Ms. Elkhalil continued to complain that Camargo's actions, changing her shift and cutting her wages in half simply because she was pregnant, were discriminatory and illegal.

64.     Camargo turned around and began shouting at her. In front of many customers and coworkers, Camargo looked at Ms. Elkhalil and shouted, "FUCK YOU, get the fuck out of the restaurant, get out of here, you FUCKING BITCH!"

65.     Before Ms. Elkhalil could respond, Camargo continued to berate her by screaming, "you are TRASHY and GHETTO," before ordering her to leave the restaurant.

66.     Ms. Elkhalil, frozen with fear, did not move. Camargo walked up to Ms. Elkhalil and put his hand up to Ms. Elkhalil's face and balled his hand into a fist. Camargo pulled his fist back in the air as if he was going to punch Ms. Elkhalil.

67.     Ms. Elkhalil was terrified for her safety and asked Camargo if he was really going to punch a pregnant woman in front of dozens of people.

68.      Instead of physically harming Ms. Elkhalil, Camargo terminated her employment in front of her colleagues and customers, effective immediately.

69.     Ms. Elkhalil was left stunned in front of numerous customers and colleagues who started apologizing to Ms. Elkhalil and comforting her following Camargo's outrageous remarks.

70.     Ms. Elkhalil was on the verge of tears as she closed out her station before walking to the bathroom to get some privacy. Ms. Elkhalil knew she had to calm down for her own sake and for the sake of her unborn child.

71.     Ms. Elkhalil believed this nightmare was over, but when she exited the bathroom, Camargo was waiting for her. Camargo continued to verbally assault Ms. Elkhalil by screaming, "hurry up and finish and get out of here!"

72.     Ms. Elkhalil stated that she would be closing out her remaining customers and collecting her earned tips. Camargo violently approached Ms. Elkhalil, raised his hands, pointed his finger in her face and said, "you better watch your mouth, I'm the boss around here!"

73.     Ms. Elkhalil, terrified that Camargo would physically strike her, begged him to stop flashing his fingers in her face. Ms. Elkhalil continued to tell Camargo that he was out-of-line for putting his fingers in a pregnant woman's face and threatening to strike her.

74.     Ms. Elkhalil saw Camargo's hand again ball-up into a fist, and she began to feel a sharp pain in her stomach and feared for her baby's life, so she walked away and took a minute to collect herself. Ms. Elkhalil was frightful that she was going to be attacked, but waited for Camargo to cool off and go back to his office. Ms. Elkhalil was again humiliated as she was physically threatened and emotionally abused in front of many of her colleagues and regular-customers that she knew well.

75.     After a few minutes, Ms. Elkhalil walked into Camargo's office before asking him to pay her what she was owed for the day's work. Ms. Elkhalil collected her money and proceeded to leave.

76.     Several of Defendant's employees who were witnesses to this series of events reached out to Ms. Elkhalil to offer their sympathy and inform her that they would support her moving forward.

77.     Further, several of Defendant's customers even reported this series of events on social media as they were in disbelief with how Defendant treated a pregnant employee. Some of the customers' Facebook comments pertaining to Defendant's discriminatory treatment towards Ms. Elkhalil were posted on Defendant's page, and included the following: "Hopefully [Defendant] got rid of their office manager who belittles his employees in front of customers" and "there is a male manager [for Defendant] who is the most obnoxious rude human being that they really should reconsider."

78.     Ms. Elkhalil texted a former colleague to inform her of what transpired, and the former colleague texted, "[Defendant] wants young hot girls who can wear crop tops and cut off shorts and I think they think pregnant girls aren't gonna attract people to come to the bar…"

79.     In or around April 21, 2024, Defendant, by and through Camargo, unlawfully terminated Ms. Elkhalil for being a pregnant woman.

80.     Even at the time Defendant terminated Ms. Elkhalil, Defendant scheduled male and non-pregnant female bartenders to work behind the bar by themselves.

81.     The events described above are just some of the examples of unlawful discrimination, harassment, and retaliation that Defendant subjected Ms. Elkhalil to on a continuous and on-going basis throughout her employment.

82.     Defendant unlawfully discriminated against Ms. Elkhalil because of her sex and pregnancy, and for requesting pregnancy-related accommodations.

83.     Defendant retaliated against Ms. Elkhalil for asserting her rights and for opposing sex and pregnancy discrimination, and for requesting pregnancy-related accommodations.

84.     Defendant violated Title VII, the PWFA, and the Florida Civil Rights Act by subjecting Ms. Elkhalil to a hostile work environment, disparate treatment, and retaliation.

85.     Defendant exhibited a continuous practice of discrimination, and Ms. Elkhalil therefore makes all claims herein under the continuing violations doctrine.

86.     As a result of the acts and conduct complained herein, Ms. Elkhalil has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Elkhalil has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Elkhalil has further experienced severe emotional and physical distress.

87.     As a result of Defendant's actions, Ms. Elkhalil felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

## CAUSES OF ACTION
### COUNT I
### 42 U.S.C. § 2000e-2
### *Title VII Discrimination*

88.     Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

89.     Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

90.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a

motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

91.     Title VII defines "because of sex" and "on the basis of sex" to include discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k).

92.     Ms. Elkhalil was an individual female and was therefore a protected class member.

93.     Ms. Elkhalil was a pregnant female and was therefore a protected class member.

94.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

95.     Defendant subjected Ms. Elkhalil to discriminatory treatment on the basis of her sex and pregnancy. Defendant's discriminatory treatment included, but was not limited to, 1) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 2) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial stability, 3) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her earnings, effectively cutting her wages in half and penalizing her for being pregnant, 4) creating and fostering an abusive and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment on the basis of her pregnancy that interfered with her ability to perform her job, 5) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence, making the workplace not only discriminatory but also unsafe, 6) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers, telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 7) failing to

engage in an interactive process after Ms. Elkhalil asked for pregnancy-related accommodations; 8) denying Ms. Elkhalil's request for pregnancy-related accommodations, and 9) unlawfully terminating Ms. Elkhalil's employment.

96.     Defendant targeted Ms. Elkhalil because of her sex and pregnancy. No similarly situated male or non-pregnant female employees endured the discriminatory conduct that Ms. Elkhalil was forced to endure.

97.     The discriminatory actions of the Defendant against Ms. Elkhalil, as described and set forth above, constitute an adverse employment action for the purposes of Title VII. In subjecting Ms. Elkhalil to adverse employment actions, the Defendant intentionally discriminated against Ms. Elkhalil with respect to the compensation, terms, conditions, or privileges of her employment.

98.     Even if Defendant could assert legitimate reasons for its adverse actions taken against Ms. Elkhalil, her protected class status, at a minimum, was a motivating factor for Defendant's discriminatory conduct and Ms. Elkhalil explicitly reserves the right to pursue a mixed-motive theory against Defendant.

99.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

100.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Elkhalil's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

101.    The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under Title VII.

102.    Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT II
### 42 U.S.C. § 2000e-3
### *Hostile Work Environment*

103.    Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

104.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment.

105.    Ms. Elkhalil was a pregnant woman and is therefore a protected class member.

106.    Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

107.    Defendant's severe and pervasive conduct included, but was not limited to, 1) subjecting Ms. Elkhalil to a demeaning and abusive work environment where she was repeatedly belittled and mocked due to her pregnancy, including Camargo telling Ms. Elkhalil, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 2) subjecting her to numerous threats of physical violence, including an incident

where Camargo aggressively confronted her, pointed his finger in her face, balled his hand into a fist before raising his fist back in the air as if he was going to punch Ms. Elkhalil, causing Ms. Elkhalil to fear for her safety and that of her unborn child, and 3) unlawfully terminating Ms. Elkhalil's employment because of her pregnancy after she was systematically subjected to wage and hour reductions and unfavorable work conditions, including forced tip-splitting and exclusion from her regular shifts.

108.    Defendants targeted Ms. Elkhalil because she was a pregnant woman. No similarly situated male or non-pregnant female employees endured the harassing conduct that Ms. Elkhalil was forced to endure.

109.    Defendant's harassment was unwelcomed by Ms. Elkhalil, who had no choice but to endure the discriminatory treatment.

110.    Defendant's harassment and discrimination of Ms. Elkhalil negatively and significantly impacted Ms. Elkhalil's life. Defendant's conduct made Ms. Elkhalil feel isolated, embarrassed, and ashamed.

111.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

112.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Elkhalil's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

113.    The conduct of Defendants deprived Ms. Elkhalil of her statutory rights guaranteed under Title VII.

114.    Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 U.S.C. § 2000e-3**
*Title VII Retaliation*

115.    Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

116.    Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

117.    Ms. Elkhalil was an individual female and was therefore a protected class member.

118.    Ms. Elkhalil was a pregnant female and was therefore a protected class member.

119.    Ms. Elkhalil engaged in a protected activity when she requested pregnancy related accommodations and opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) ignoring Plaintiff's repeated requests for accommodation, 2) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 3) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers, telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 4) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial

17

stability, 5) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her earnings, effectively cutting her wages in half and penalizing her for being pregnant, 6) creating and fostering an abusive and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment that interfered with her ability to perform her job, 7) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence, including an incident where Camargo aggressively confronted her, pointed his finger in her face, balled his hand into a fist before raising his fist back in the air as if he was going to punch Ms. Elkhalil, making the workplace not only discriminatory but also unsafe, and 8) denying Ms. Elkhalil's request for pregnancy-related accommodations.

120.   Ms. Elkhalil explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to her manager, Camargo.

121.   In response to Ms. Elkhalil asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Ms. Elkhalil.

122.   Defendant retaliated against Ms. Elkhalil by unlawfully terminating Ms. Elkhalil's employment.

123.   Defendant took the above-mentioned materially adverse action, among others, against Ms. Elkhalil because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

124.   Any reasonable employee in Ms. Elkhalil's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Elkhalil was forced to endure.

125.     Defendant's alleged basis for its adverse employment actions against Ms. Elkhalil are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

126.     As a direct and proximate result of the Defendant's retaliatory conduct in violation of Title VII, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

127.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Elkhalil's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

128.     The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under Title VII.

129.     Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT IV
### 42 U.S.C. § 2000gg-1
### *PWFA Discrimination*

130.     Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

131.     The PWFA provides that it is unlawful for an employer to deny employment opportunities, or to take an adverse action in the terms, conditions, or privileges of employment, against a qualified employee on account of the employee requesting or using a reasonable

accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee. 42 U.S.C. §§ 2000gg-1(3), (5).

132.    A known limitation under the PWFA includes any physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000gg(4).

133.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

134.    Ms. Elkhalil requested reasonable accommodations including additional breaks and a limitation on physical exertion due to her pregnancy-related medical conditions.

135.    Defendant failed to reasonably accommodate Ms. Elkhalil's pregnancy and pregnancy-related conditions and failed to engage in an interactive process regarding her accommodation requests.

136.    Defendant entirely ignored Ms. Elkhalil's request for pregnancy-related accommodations despite her numerous attempts to obtain an accommodation.

137.    Ms. Elkhalil could perform the essential functions of her position with or without a reasonable accommodation. Ms. Elkhalil was experiencing morning sickness and nausea, resulting in a need for an accommodation in the form of additional breaks. Ms. Elkhalil further felt physically weaker as a result of her pregnancy, impacting her ability to lift or carry heavy items. Ms. Elkhalil's pregnancy further impacted her ability to concentrate and focus.

138.    Ms. Elkhalil's requested pregnancy-related accommodations to Camargo would allow her to fulfill all of her job duties at the high level she had been for years.

139.    Rather than assessing the accommodation request, Defendant ignored Ms. Elkhalil's request altogether.

140.     Defendant subjected Ms. Elkhalil to discriminatory treatment on the basis of her sex and pregnancy. Defendant's discriminatory treatment included, but was not limited to, 1) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 2) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial stability, 3) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her earnings, effectively cutting her wages in half and penalizing her for being pregnant, 4) creating and fostering an abusive and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment on the basis of her pregnancy that interfered with her ability to perform her job, 5) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence on numerous occasions, making the workplace not only discriminatory but also unsafe, 6) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers, telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 7) failing to engage in an interactive process after Ms. Elkhalil asked for pregnancy-related accommodations; 8) denying Ms. Elkhalil's request for pregnancy-related accommodations, and 9) unlawfully terminating Ms. Elkhalil's employment.

141.     Defendant targeted Ms. Elkhalil because she was pregnant and because of her known limitations related to her pregnancy. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Elkhalil was forced to endure.

142.     Ms. Elkhalil's request for pregnancy-related accommodations included, but was not limited to, obtaining additional breaks and limiting excessive physical exertion. Defendant not only failed to accommodate her but actively made her working conditions more difficult by reducing her wages and increasing her stress.

143.    The discriminatory actions of the Defendant against Ms. Elkhalil, as described and set forth above, constitute an adverse employment action for the purposes of the PWFA. In subjecting Ms. Elkhalil to an adverse employment action, the Defendant intentionally discriminated against Ms. Elkhalil with respect to the compensation, terms, conditions, or privileges of her employment.

144.    Further, Defendant failed to engage in the interactive process required under the PWFA by refusing to acknowledge or discuss Ms. Elkhalil's request for pregnancy-related accommodations. Defendant made no effort to explore potential reasonable accommodations or alternatives, despite Ms. Elkhalil's repeated attempts to initiate this discussion.

145.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the PWFA, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

146.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Elkhalil's rights under the PWFA, warranting the imposition of punitive damages, in addition to compensatory damages.

147.    The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under the PWFA.

148.    Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

<u>**COUNT V**</u>
**42 U.S.C. § 2000gg-2(f)**
*PWFA Retaliation/Interference*

149.    Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

150.    The PWFA prohibits retaliation in any manner against a person who has opposed an unlawful discriminatory practice or act, or who has participated in any investigation, proceeding, or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000gg-2(f)(1).

151.    The PWFA further prohibits an employer from coercing, intimidating, threatening, or interfering with any individual's exercise of any protected rights, or on account of any individual having exercised any protected rights. 42 U.S.C. § 2000gg-2(f)(2).

152.    Ms. Elkhalil was pregnant and requested pregnancy-related accommodations, and was therefore protected under the PWFA.

153.    Ms. Elkhalil engaged in a protected activity under the PWFA when she informed Defendant of her pregnancy, requested reasonable accommodations from Defendant on account of her pregnancy, and opposed Defendant's unlawful conduct in violation of the PWFA.

154.    In response to Ms. Elkhalil asserting her protected rights under the PWFA, Defendant retaliated against Ms. Elkhalil.

155.    Defendant retaliated against Ms. Elkhalil and interfered with Ms. Elkhalil's rights by engaging in conduct, including but not limited to, 1) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 2) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial stability, 3) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her earnings, effectively cutting her wages in half and penalizing her for being pregnant, 4) creating and fostering an abusive

and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment on the basis of her pregnancy that interfered with her ability to perform her job, 5) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence on numerous occasions, making the workplace not only discriminatory but also unsafe, 6) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers, telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 7) failing to engage in an interactive process after Ms. Elkhalil asked for pregnancy-related accommodations; 8) denying Ms. Elkhalil's request for pregnancy-related accommodations, and 9) unlawfully terminating Ms. Elkhalil's employment.

156.    Defendant took the above-mentioned materially adverse actions, among others, against Ms. Elkhalil because of her protected activities.

157.    Defendant's alleged bases for its adverse employment actions against Ms. Elkhalil are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

158.    As a direct and proximate result of the Defendant's retaliatory conduct in violation of the PWFA, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

159.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Elkhalil's rights under the PWFA, warranting the imposition of punitive damages in addition to compensatory damages.

160.     The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under the PWFA.

161.     Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT VI
### § 760.10(1), Fla. Stat.
### *FCRA Discrimination*

162.     Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

163.     The FCRA prohibits employment discrimination against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's sex or pregnancy. § 760.10(1)(a), Fla. Stat.

164.     Ms. Elkhalil was a member of multiple protected classes under the FCRA, as she was a female, and she was pregnant.

165.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

166.     Defendant subjected Ms. Elkhalil to discriminatory treatment on the basis of her sex and pregnancy. Defendant's discriminatory treatment included, but was not limited to, 1) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 2) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial stability, 3) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her

earnings, effectively cutting her wages in half and penalizing her for being pregnant, 4) creating and fostering an abusive and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment on the basis of her pregnancy that interfered with her ability to perform her job, 5) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence on numerous occassions, making the workplace not only discriminatory but also unsafe, 6) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers, telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 7) failing to engage in an interactive process after Ms. Elkhalil asked for pregnancy-related accommodations; 8) denying Ms. Elkhalil's request for pregnancy-related accommodations, and 9) unlawfully terminating Ms. Elkhalil's employment.

167.    Defendant targeted Ms. Elkhalil because of her sex and pregnancy. No similarly situated male or non-pregnant female employees endured the discriminatory conduct that Ms. Elkhalil was forced to endure.

168.    The discriminatory actions of the Defendant against Ms. Elkhalil, as described and set forth above, constitute an adverse employment action for the purposes of the FCRA. In subjecting Ms. Elkhalil to adverse employment actions, the Defendant intentionally discriminated against Ms. Elkhalil with respect to the compensation, terms, conditions, or privileges of her employment.

169.    Even if Defendant could assert legitimate reasons for its adverse actions taken against Ms. Elkhalil, her protected class status, at a minimum, was a motivating factor for Defendant's discriminatory conduct and Ms. Elkhalil explicitly reserves the right to pursue a mixed-motive theory against Defendant.

170.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

171.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Elkhalil's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

172.     The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under the FCRA.

173.     Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**§ 760.10(7), Fla. Stat.**
*Hostile Work Environment*

174.     Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

175.     The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1), Fla. Stat.

176.     Ms. Elkhalil was a pregnant woman and is therefore a protected class member.

177.     Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

178.    Defendant's severe and pervasive conduct included, but was not limited to, 1) subjecting Ms. Elkhalil to a demeaning and abusive work environment where she was repeatedly belittled and mocked due to her pregnancy, including Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 2) subjecting her to numerous threats of physical violence, including an incident where Camargo aggressively confronted her, pointed his finger in her face, balled his hand into a fist before raising his fist back in the air as if he was going to punch Ms. Elkhalil, causing Ms. Elkhalil to fear for her safety and that of her unborn child, and 3) unlawfully terminating Ms. Elkhalil's employment because of her pregnancy after she was systematically subjected to wage and hour reductions and unfavorable work conditions, including forced tip-splitting and exclusion from her regular shifts.

179.    Defendants targeted Ms. Elkhalil because she was a pregnant woman. No similarly situated male or non-pregnant female employees endured the harassing conduct that Ms. Elkhalil was forced to endure.

180.    Defendant's harassment was unwelcomed by Ms. Elkhalil, who had no choice but to endure the discriminatory treatment.

181.    Defendant's harassment and discrimination of Ms. Elkhalil negatively and significantly impacted Ms. Elkhalil's life. Defendant's conduct made Ms. Elkhalil feel isolated, embarrassed, and ashamed.

182.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of

dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

183.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Elkhalil's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

184.    The conduct of Defendants deprived Ms. Elkhalil of her statutory rights guaranteed under the FCRA.

185.    Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**§ 760.10(7), Fla. Stat.**
*FCRA Retaliation*

186.    Ms. Elkhalil reincorporates the factual allegations in Paragraphs 20 through 87.

187.    The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

188.    Ms. Elkhalil was an individual female and was therefore a protected class member.

189.    Ms. Elkhalil was a pregnant female and was therefore a protected class member.

190.    Ms. Elkhalil engaged in a protected activity when she requested pregnancy related accommodations and opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) ignoring Plaintiff's repeated requests for accommodation, 2) Camargo telling Plaintiff, "I'm the manager! I make the schedule! You're pregnant! What schedule do you expect to get!?", 3) Camargo screaming at Ms. Elkhalil in front of her colleagues and customers,

telling her "fuck you, get the fuck out of the restaurant, get out of here you fucking bitch!" and calling her "trashy and ghetto," 4) intentionally assigning Ms. Elkhalil less favorable work shifts due to her pregnancy, directly reducing her ability to earn tips and undermining her financial stability, 5) deliberately staffing additional employees on Ms. Elkhalil's shifts for the purpose of diluting her earnings, effectively cutting her wages in half and penalizing her for being pregnant, 6) creating and fostering an abusive and hostile work environment by berating Ms. Elkhalil on a regular basis, subjecting her to degrading treatment that interfered with her ability to perform her job, 7) escalating the hostility to the point of threatening Ms. Elkhalil with physical violence on numerous occasions, including an incident where Camargo aggressively confronted her, pointed his finger in her face, balled his hand into a fist before raising his fist back in the air as if he was going to punch Ms. Elkhalil, making the workplace not only discriminatory but also unsafe, and 8) denying Ms. Elkhalil's request for pregnancy-related accommodations.

191.    Ms. Elkhalil explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to her manager, Camargo.

192.    In response to Ms. Elkhalil asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Ms. Elkhalil.

193.    Defendant retaliated against Ms. Elkhalil by unlawfully terminating Ms. Elkhalil's employment.

194.    Defendant took the above-mentioned materially adverse action, among others, against Ms. Elkhalil because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

195.    Any reasonable employee in Ms. Elkhalil's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Elkhalil was forced to endure.

196.    Defendant's alleged basis for its adverse employment actions against Ms. Elkhalil are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

197.    As a direct and proximate result of the Defendant's retaliatory conduct in violation of the FCRA, Ms. Elkhalil has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Elkhalil has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Elkhalil accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

198.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Elkhalil's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

199.    The conduct of the Defendant deprived Ms. Elkhalil of her statutory rights guaranteed under the FCRA.

200.    Ms. Elkhalil further requests that her attorney's fees and costs be awarded as permitted by law.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

31

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendant for all damages suffered by Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of Title VII, the PWFA, and the FCRA.

Dated: Miami, Florida
May 6, 2025,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Danielb@dereksmithlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 6, 2025, I electronically filed the foregoing through the CM/ECF system and also certify that the foregoing document is being served this day on Cody J. Shilling, Esq., Black Law, P.A., 1401 E. Broward Blvd., Suite 204, Fort Lauderdale, Florida 33301, Email: cs@blacklawpa.com, via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.

33